In this case, Your Honors, as you know, the BIA accepted Mr. Alonzo's, that he has suffered past persecution. As a result, he is a refugee under the Act. The only way to find that he is not a refugee is if there's a finding that there has been a fundamental change such that he no longer has a wealth of him for future persecution. The BIA is tasked with making two determinations. First, whether there's a fundamental change in conditions. Second, whether that fundamental change is such that Mr. Alonzo would no longer have a wealth of him there. The BIA made two errors in this case, or potentially three errors in this case. First, they did conduct an individualized analysis, perhaps you could argue. However, they made two errors in that analysis. They made two errors in their analysis. I would say they made three, but I'll start with two. First, the two errors I would say that they made is that they shipped the burden to Mr. Alonzo to show that he would suffer well done if there were future persecution, and they relied on informational factors. It can ship to the burden to Mr. Alonzo. And third, in their analysis, there are not a lot of big issues what they're going to rely on. So, going to what the fundamental change is in CDs that they've known, I would say that the BIA found the fundamental change was in 1996 in these accords. And so, what is the analysis they did? They said they reviewed the entire record, and they looked at the expiration date. Mr. Gayatz did not go to Petra, to Guatemala several times in the 1980s, 90s, and did not suffer persecution in all these occasions, correct? Well, I would say that that's a mischaracterization of the record, and I would also say that those factors occurred before the fundamental change. So, I would argue that the factors, those factors have the giant to look at. Well, even before the peace accords, he was not persecuted. Well, he was persecuted. No. He did not support some of the accords. Well, no. I think if you look at the full record, and you look at the country conditions until the peace accords, Dr. Grandin, the expert, is clear that he was continuing his opposition work in a clandestine manner. He was in hiding. If he had tried to do his work not in hiding, he would have been killed. All activists at that time were murdered. They were executed. And so, I don't think any reasonable fact finder could find a opposition leader like Mr. Alonzo, who had already been arrested, tortured, and labeled as aggressive, could live in Guatemala safely. He was living there. In the hiding, he was being survived. He was also involved in a law school program, and that's not what I would call hiding. Well, I think, I mean, there was a lot going on in Guatemala, and that's how the movement was being put forward, was through the universities. And so, in order to be part of the university, the student movement, you need to enroll in the university. Well, I think the question that Judge Mejia is pursuing, and frankly, I have the same concern, based on the numerosity of visits. And the only incident that I think he testified to was the sighting of the suspicious Jeep and the radio traffic that he heard. But the fact remains that he did not suffer any further harm on all of these visits. And then, the question is, was it on the board or the IJ? But if you look at that fact, coupled with the signing of the peace accords in 1996, and include that there was no objective fear of future persecution, isn't that what they were focusing on? Well, sir, there is a presumption of wealth and of fear stemming from the past persecution, and I would argue that those events were all part of the same past persecution determination. And all of those factors... I think you're quarreling. I thought they concluded that those subsequent events were not evidence of persecution because it wasn't proven. What I'm saying is, once the past persecution was found, I am saying they were within the past persecution because he's been tied onto the presumption of wealth and of fear. And so, in order to overcome the presumption, there has to be a fundamental change. And so... It really isn't a fundamental change from the signing of the peace accord and the reforms that never occurred, which was the subject of the State Department reforms. Right. So I agree that that would be... I say it was a fundamental change, and I don't know how you can take that fundamental change and apply it backwards to events that occurred prior to the fundamental change. That's how I interpret the fundamental change. I'm just trying to understand what you're saying. Yes, we turned trips to Guatemala that occurred before the fundamental change. So the fundamental change... But I think that's... Because my question was, the board's characterization of essentially what we'll call SACE, Return that occurred after the acts of persecution. And then on top of that, we have the 1996 peace accords. And after that, we have the State Department country condition reports, which say what they say. And why isn't that substantial evidence to support the board's claim that there had been a change in country condition? Because I agree with you that the board is not tasked with determining whether there's been a change in country condition. The board is tasked with determining whether there's been a fundamental change, such that Mr. Arlotto would no longer experience... Would no longer have welfare and fair conditions. In the case of CVSA, does that evidence reply to the presumption that he is otherwise entitled to? Right. If the change in country conditions was in 1996, it occurred in 1996, the change in country conditions, a fact is the presumption of welfare and fair. You would have to look forward to determine whether it affects his presumption of welfare and fair. You can't look backwards and apply a change in circumstances that occurred after his return trips. Backwards. Does that mean you're putting the burden on him, really, to show that he had a welfare and fair? Maybe you misunderstood the timeline. I thought that the actual season of peace occurred prior to his returns to Guatemala. Isn't that true? Yes. And somewhere in there, we have the 1996 peace accord. So why isn't that all evidence that the court can consider in determining whether or not he has an objectively reasonable fear of future persecution? I want to make sure he doesn't have to say anything. I'll have you say your time. Thank you. Because, again, the incident occurred in 1978, where he was arrested in prison and labeled as a subversive and tortured. Thus, he has persecution. And so he's entitled to a presumption of welfare and a fear of future persecution. But he has to be a fundamental change in circumstances. After 1978, correct? Yes. In 1978. And so, I guess the question is, is the fundamental change in circumstance that he returned to Guatemala? I mean, if the court is saying that the fundamental change of circumstances is not really the in 1989 through 1990, or 1990 through 93, without suffering an arrest and detection, that would be a shortage on him. So, what makes you think that would be a shortage on him? He did have a threat. And, again, to determine, I think it's putting the burden on him to show that he has a welfare and a fear. But even if you feel that it's not, that that's a change in circumstance, I don't think that the record bears out that he did go back to Guatemala safely. He was delighting in his brother-in-law's tailor shop. He was still in opposition of the government. He said himself that he had a 99% chance of being killed. And then we have the expert opinion by a well-renowned expert on country conditions in Guatemala that said this is exactly how the government operated at this time. They would surveil opposition leaders and eventually execute them. And that Mr. Alonzo was lucky to have stayed in Guatemala before the peace accords in 1993 when he last escaped it. And he would go, go, go, go. Right. And this court did a couple of things about that. This court has found that a change in government alone is not sufficient to find a fundamental change in circumstance. It needs to be shown that this, that the applicant would no longer have a fear of persecution under this change in government. And so I would say, Dr. Grant, his report found, and his expert opinion again, that there's a high probability that Mr. Alonzo would be harmed if he returned to Guatemala and that the deserants were still operating clandestinely, which is how they operated in the 1980s and 90s. And so, yes. Do you want to say anything else? Yes, thank you. Thank you very much. Any other questions? On behalf of the Attorney General, the Court would ask this Court to uphold the agency of decision and deny the petition for review. This case presents some interesting questions, and I think I'd like to start by urging this Court to note that there were really two separate claims here, which was labeled based on the teacher's past legal activism, his two-year activism in Guatemala. He's now to have a face-to-face persecution that creates the presumption of future persecution, which the Court found was rebutted. But then there's a separate claim that it's an independent basis for relief. That's not my words. That's a petitioner's words, and he's briefly described it as an independent basis for relief. That's based on his repeated activities. And after he comes to the United States, he's going to be working here in California. What the petitioner's complaint is that the Court didn't properly analyze all this, and the petitioner is really trying to blend both of those claims together and to urge this Court to consider his human activity here in California as a continuation of his political and his human activism in Guatemala. Thank you for that. The problem, as I read the record, is the activity that he had on behalf of the families, which he had given to the other federal authorities, had ended, which was about to go soft, ended, dissolved. So he wasn't working in any Guatemala. He knew that he was in the Philippines or in Colombia, but he knew that he was in the United States. Is that correct? And that's my understanding of the record. I agree to this point, though. I think the petitioner is urging this Court to look at his union work here in California as a continuation of his commitment to political, social activism. My point is something that's when those two claims are submitted, they're different, and they aren't necessarily subject to different analysis because the union work in California has ever been, has ever been qualified to pass a prosecution. It couldn't be because it occurred here in the United States, so there's separate analysis there. I think there is perhaps a diffusion in the record as to what work he was called to do a few years back. Virginia Beach is 54 in the record. He's asked, though, about his union work first. I think that's worth a week for my colleagues here, but I'm far more concerned about the first thing than I am about the second. I don't think it's hard to tell that the petitioner told his union that there is no nexus between the union team and the commission in California, but I am concerned that the BIA seems to have made a very highly generalized analysis with regard to the evidence of changed political conditions, and I'm wondering whether the Board met with Justice Anderson and the panel in establishing individualized risk of prosecution as to his current work. I think the short answer is yes, the Board properly applied enough of it into the sufficiently individualized analysis. Certainly the Board starts with there has been a fundamental change in one of all the piece of work you've signed. That's in the mid-1990s, but then the Board goes on to note several additional factors, and they're not in the factors that the Board notes are specific to the petitioner's individual claim. The oath, for example, as was discussed earlier, if he went back to trial almost several times, would that look like a vehicle for him? That's correct, Your Honor. But my point there is simply that the question we sought to answer is, was the analysis sufficiently individualized? The Board did not say simply Peace Accords, 1996, Peace Accords. The Board started with that, understandably, and I would make the point that this was not simply a change in government, a change from one party to the other. This was a sea change from decades of a petitionership to a democratically elected government with the Peace Accords. The State Department reports there is a record. We certainly reflect that there are still some difficulties there, but we start with what the Board started with and fundamentally changed. If the Board had said that, I would not be making this argument, but the Board had notes on page 4 of the record to note that he doesn't know that he ended the petition. Could I testify whether a party that he had been part of was even still in existence? He is individually. They note that he remained in Guatemala after he was arrested. They note that he returned multiple times, and that at the bottom of page 4 of the record is going over a time. The Board notes that there is no evidence or assertion that the clandestine groups, which is one of the groups that he fears, are targeting individuals such as the petitioner, solely on the basis of their passages to activism from decades ago. What about the testimony from the other members of the executive? The expert who submitted a declaration, or the parties who had seen him go out testifying about his declaration, pointed out a couple of things. Number one, he certainly helped in the petitioner's case. But one of the things that he says is that there are peer-to-peer witnesses who care about the relevance of his declaration. At the bottom of page 357 of the record, the clandestine groups continue to target those who work to end impunity or fight for political reform. Just look amply and read that he's talking about activists who are collectively active in the work world. The State Department reports are not inconsistent with that. But he's not talking about the individualized analysis that Gerardo had asked about earlier, past student activists, past and former student activists. It's not a question of their ongoing commitment to the cause. If there's a hitch there, even if the hitch is being made at the present time, it is not a connection that can be made. Gerardo, I'm not afraid to assume that that's the case. Yes, sir. And I would urge the court to consider, as well, this is a statement, a declaration from an expert, but it's prepared for litigation. It certainly is somewhat tailored to the petitioner's case. If there were evidence to offer as to potential harm for former student activists, it could have been in there. But I think the fact that that is not in the expert's declaration is also a fair factor for this court to consider. I'd also like, briefly, to address one of the, perhaps, the elephant in the room here in the play. This case started back when, just to reply for a second, in 1994. We're here in 2017. I am not going to see here, on behalf of the government, see that the shape of the play is a good thing or is acceptable. But I would urge the court to consider that this was not a 23-year delay. This was several individual delays. Originally, the first delay, as the petitioner notes, is briefing, applied briefing, applied for asylum. And there was the eight-year delay in getting in and interviewing with the asylum officer. And that's the elephant, right? That's the elephant. Yeah, it's the elephant for a local individual apparently. Absolutely right. And our brief in page 24.5 recognizes that. Unfortunately, that type of play, that time period, was not a 24-year delay. But then, not a stand-alone contract with the DHS that they were assigned in the case, got transferred, or sent overseas, or something, and then there was a five-year delay. There was another five-year delay. There's not a lot of information on the record about the deterrence. Well, so what's your point? I mean, it sounds like the government's responsible more than it was their line of hope for the delay. And so the government bears some responsibility for that 24-hour delay. I would point out, though, that the DHS did not have a 24-hour delay, particularly, though, with regard to that first delay. The second delay started in 2004. The immigration court is questioned on direct examination. The government says, wait a minute. We might have a bar to asylum that applies. They want them to check out. And the record reflects this. The record is that the corporal thought they were going to take a contiguous backing up on them, too. There's actually a witness who was in Guatemala that wanted to make sure they weren't going to lose their adjustment. Everyone thought they were coming back soon. But there's actually an issue of education. It's benefited the petitioner, right? I think it did, Your Honor, that he was allowed to stay in the United States. I raise this simply because there's certainly new situations or implications in the record that may be in the brainstorm of the petitioner that the petitioner did everything he could to move this case forward. And the government somehow blocked it. However, in 2004, when the government asked for a contiguous, the petitioner didn't object. Now, everyone was listening. Everyone thought they were coming back in a month or two. But when that month or two became, as Your Honor noted, five years, there were still no objections from the petitioner. In fact, one of the contingencies in that time period came from a request from the community, came from the petitioner. So in fact, my point is not that the delays are key, but that all of those delays in particular are an objection of what was for a contingency made and is not an objection to. He's likely talking very intently about it. No, no, no. They were not looking at the civil lands of 2017. Our law stuck with the record that was compiled in 2004. I mean, that's the basis on which we have to make the determinations and whatnot. I see what Dr. Tarver earlier answered. Thank you. Yes, this is your answer. And this Court is working on forever again. So thank you very much for your questions. Thank you, Your Honor. Thank you. So just to start off really quickly, Mr. Alonzo applied for asylum three months after he arrived in the United States, after he fled Guatemala and here for his life. And he did not cause a delay. But I don't think passage of time is relevant to this decision. No, I mean, that's essentially your only concern throughout the time. Because it's certainly inert to your client's benefit that he's going to allow you to stay in the world. I don't know if he would have. I don't think any of this would come up if asylum was adjudicated in 1994. But in any case, Your Honor, I want to just address a couple of things that BIA shifted the burden to Mr. Alonzo. In fact, they created such a high burden for him when the BIA said that he is not shown that he would be persecuted solely on the basis of his past membership in Guatemala. And the opposition group then is putting a burden that is not even put on applicants who have to show well-founded fear of persecution. We believe that presumption should not be putting Mr. Alonzo in a worse position than if he were applying for just applying for asylum during a well-founded fear of future persecution. Dr. Brandon's report, he is an expert, which was not challenged in the lower court. It can't be challenged now. He was accepted as an expert. And an offer of proof was made from his testimony and with his testimony. Dr. Brandon, the expert, implied that there was a high probability that Mr. Alonzo would be harmed if he returned to Guatemala. Mr. Brandon didn't know anything about his union activities and had nothing to do with the union activities in the US. They had to do with his opposition leadership in the 90s in Guatemala. And the BIA did not make him choose. And that's what they did in this case. They shifted the burden to Mr. Alonzo. And they chose not to even address the expert opinion. And there is an individualized expert opinion in this record that says there's a high probability that he will be harmed. And there's nothing to contradict that expert opinion. So is your argument, using my characterization of the broad generalities that the board relied upon, is your argument that that's simply not sufficient to refer to the expert testimony? Yes, sir. Is it requiring the government to inform them that it's only a spurt or some better evidence than what they need? Yes, sir. So should we remand this to the board to reopen or what? I would argue that no reasonable fact finder, based on this record with Dr. Brandon's report, is saying that there's a high probability that he'll be harmed. That there are no reasonable fact finder could look at the evidence in the record as a whole and find that a well-founded theorist may be harmed. But alternatively, yes, a remand so that the BIA could apply the proper analysis and not shift the burden would also be sufficient to do that. Thank you very much. Thank you. The case is argued and submitted.
judges: Siler, Tallman, Bea